## 67334. BROOKS v. STONE et al.

Deen, Presiding Judge.

The facts in this case at first blush almost suggest the innocuous talking animal characters and fictions contained in Aesop's Fables. This case involves the editors of the Medical College of Georgia publication *Cadaver*, who use the pen name "Bones," along with and including other characterizations such as birds, bird cages, German shepherds and other dogs, camels, humping bitches in heat, possible sexual connotations and a student nurse, Mrs. Brooks. The latter was married and two months pregnant at the time of the publication.

The nurse's letter and the editor's response published in the *Cadaver* are as follows:

### "GRADUATE NURSING STUDENT COMPLAINS OR 50 WAYS TO IRRITATE THE EDITORS

"Dear Editors:

"During orientation I caught myself almost wishing things would be the same here at MCG as they were two years ago. *Almost* everything that is.

"This year I hope that the editors of the *Cadaver* have more sense of humor (in a less sick way), have more respect for the students that aren't in the School of Medicine, and that they just have more sense!

"If things aren't going to change in the Editor's Office, I hope that the nursing students and allied health students won't put up with it.

"Nursing students, I appeal to you — Write! Add articles, announcements, and letters so that the pages will not be filled up with junk this year. Write — so articles by 'Ramondo' won't have to be dug out of the garbage heap again.

"Editors — I appeal to you. Make the *Cadaver* a paper everyone can read. There *is* a difference in humor and trash. If you do — maybe the *Cadaver* will be in the hands of students more — and in the bottom of bird cages less.

Sincerely,
S. Brooks, Graduate Student"

Reply:

"Dear Ms. Brooks:

"You are obviously a sensitive, caring member of society. We appreciate that, we really do, and certainly with your God given sensitivity, you should try to understand how and why those less fortunate members of our society deviate from acceptable forms of behavior. Take us for example, our style of humor is really out of control. Well, let us give you a little family history and you'll understand.

"We have backgrounds different from the rest of you. Our

mothers were German Shepherds; our fathers were Camels, so naturally we love to hump bitches in heat. Say, Ms. Brooks, when do you come in season?

Bones"

Had the editors omitted the last sentence, "Say, Ms. Brooks, when do you come in season?", a different result would obtain. In the light of the other part of the editorial reply in its totality, this sentence under the law creates a jury issue as to liability for libel. That portion of the remarks and reply relating to paternal and maternal genetic genealogy, whether intended and believed literally or as fiction, was not in itself alone objectionable as to Mrs. Brooks or her family, as it referred to the ancestry of "Bones," or the editors.

Appellee relies on Pring v. Penthouse Intl., 695 F2d 438, 440 (10th Cir. 1982), and two other federal circuit cases. An article in the Pring case was published about the Miss America Contest, describing Miss Wyoming as performing an act of fellatio on her coach and her baton, and remembering such an act with a football player. The court ruled that while this was tasteless and crude, it was non-libelous. This case is not binding on the courts of our state, is a 2-1 decision with one judge dissenting, and contains a key distinction in that the publication referred to Miss Wyoming as "Charlene," whereas the real Miss Wyoming in the contest was named "Kimerli Jayne Pring." Defendants further contend that, even assuming they were calling Mrs. Brooks a "bitch," this is no more offensive than calling someone a "bastard," a "son-of-a-bitch," a "traitor," a "scab," a "near-neanderthal," or a "paranoid," which have, they assert, been held non-actionable in different jurisdictions. In those cases, however, no additional suggested sexual innuendo or connotations were involved.

" 'In an action for defamation it is immaterial what meaning the speaker intended to convey. He may have spoken without any intention of injuring another's reputation, but if he has done so he must compensate the party. He may have meant one thing and said another; if so he is answerable for so inadequately expressing his meaning. If a man in jest conveys a serious imputation he jests at his peril. Or he may have used ambiguous language which to his mind was harmless, but to which the bystanders attributed a most injurious meaning; if so he is liable for the injudicious phrase he selected. What was passing in his own mind is immaterial save in so far as his hearers could perceive at the time.' " *Southeastern Newspapers v. Walker*, 76 Ga. App. 57, 61 (434 SE2d 697) (1947).

"Where the words used are capable of having two or more different meanings, they are ambiguous and the plaintiff may allege the meaning with which he claims they were published, and it is for the jury to determine whether they were so published. *Blackstock v. Fisher*, 95 Ga. App. 17, 121 (97 SE2d 322). The testimony of readers

of the alleged defamatory language as to what they understood the words to mean may be admitted where the meaning is doubtful or ambiguous. 53 CJS 311, Libel and Slander, § 201b. Compare, *Kaplan v. Edmondson*, 68 Ga. App. 151 (1) (22 SE2d 343). See, 3 Restatement of Torts (2d) 164, § 563e." *Macon Telegraph Publishing Co. v. Elliott*, 165 Ga. App. 719, 723 (302 SE2d 692) (1983), cert. vacated 251 Ga. 544 (309 SE2d 142) (1983). The language in the latter case (that certain persons had decided to vote not guilty before deliberations began) was considered in the case to mean what the average reader construes it to mean and was there held to be a question for the jury.

We held in the whole court case of *Southern Bell v. Coastal Transmission Svc.*, 167 Ga. App. 611 (307 SE2d 83) (1983) that negligence in substituting one letter — "R" for "G" — get it in rear instead of get it in gear — was for the jury and that the trial court erred in failing to charge on a limitation of liability clause. In *Kaplan*, supra at 151, the plaintiff was called a "damned old bitch." This court held that it was a jury question as to whether the word "bitch" was understood to include that she was "a whore and a common prostitute, guilty of the offense of fornication and adultery, a criminal offense under the laws of Georgia, and by the use of the said epithet meant that she was guilty of debasing acts which of their nature may exclude her from society, and that the said charge was false and was maliciously made by the defendant, damaging her good name and reputation . . ." Id. at 152. Compare: " '[A]ll cops are dogs'; pointing his finger at Glasgow, Brooks yelled: 'Like this man right here . . . This man here is a dog.' Glasgow then told Brooks that he was under arrest and grabbed him by the arm." *Brooks v. State*, 166 Ga. App. 704 (305 SE2d 436) (1983).

Extravagant and allegorical references to the defendant or his alleged acts, if the evidence warrants, during trial arguments in court cases, and labels such as "mad dog" and "beast" have been allowed and protected as flights of oratory. *Miller v. State*, 226 Ga. 730, 731 (5) (177 SE2d 253) (1970); *Shelton v. State*, 146 Ga. App. 763 (247 SE2d 580) (1978).

Conflicting affidavits are provided in this case as to the understanding and reception of the *Cadaver* humor, ridicule, format and content. Defendants' expert concedes that some of the format and content is risqué and off-color, but argues that this has become accepted as literary license meant for humor, and understood in this context as a type of safety valve for student frustrations within the medical community. On the other hand, affidavits of non-experts were provided opposing the motion for summary judgment. Courts do not necessarily require expert testimony in cases where alleged obscenity is involved. *Stancil v. State*, 155 Ga. App. 731 (272 SE2d 511) (1980). These affidavits include the understanding of the editorial reply as

questioning the character and chastity of plaintiff and implying that she was a bitch in heat, with connotations she was sexually promiscuous and one with whom the editors would like to have sex. This context suggests the noun "bitch" coming in season — not the verb "bitch," as to the meaning of the reply as understood by those within the community. These affidavits allegedly reflect the standards of many or the majority of those receiving the *Cadaver*, indicating that many readers object to and were not receptive to overly permissive remarks of sexual promiscuity in the *Cadaver* and particularly regarded much content as junk and garbage.

It appears to be uncontradicted that appellee Caplan was out of town when the reply was written and only participated in proofreading the November 23, 1983, issue for spelling and grammatical errors. Therefore, the order of the trial court should be affirmed as to this defendant and reversed as to the other editors, because issues for the jury exist as to them. While there was a re-run of the article and reply in a subsequent issue of the *Cadaver* this was done in context with news of Mrs. Brooks having filed her lawsuit.

In his dissent, Judge Sognier invokes a doctrine of provoked libel, i.e., one who is at fault himself cannot recover civil damages from another who has retaliated in kind. He relies upon the solitary Louisiana case of McGee v. Collins, 100 S 430, 435 (1924). That doctrine expounded in McGee v. Collins does not appear ever to have surfaced before in Georgia, and, in my opinion, it is inapplicable in this case.

There appear to be two essential elements to the provoked libel doctrine: (1) The plaintiff originally was "at fault"; and (2) the libel defendant merely retaliated "in kind." In this case, I do not believe the plaintiff can be considered "at fault." Despite her somewhat disparaging description of the *Cadaver*, two things must be remembered: (1) A letters-to-the-editor feature customarily serves as a forum for reader opinion, including criticism of the newspaper itself; and (2) the plaintiff obviously was criticizing *the nature and quality of the newspaper*, and did not launch a personal invective upon the editors. It would stretch one's legal imagination to find the plaintiff's limited criticism of the editorial staff to be libelous. Because the plaintiff was not at fault, the defendants' response may not be considered retaliation in kind, and the plaintiff's cause of action thus would not be defeated by such a doctrine of provoked libel.

While first amendment rights of free speech and free press are broad and extensive, they are not absolute to the extent of protecting libel, false advertising, yelling "fire" in a crowded theater, or injuring the reputation of others. Although the plaintiff may have initiated the exchange by a letter to the editor, her remarks at most may be considered by the jury in mitigation of any damages, in the event liability is found. What we cannot say as a matter of law and on summary

judgment is that no issue remains for jury consideration as to whether the editor's letter was libelous or not.

*Judgment reversed, except affirmed as to appellee Caplan. Quillian, P. J., Shulman, P. J., and Birdsong, J., concur. McMurray, C. J. and Carley, J., concur in the judgment only. Banke, Sognier and Pope, JJ., dissent.*

DECIDED MARCH 7, 1984 —
REHEARING DENIED MARCH 26, 1984 — 

*William J. Sussman, Victor Hawk*, for appellant.
*N. Gail Duffie, David E. Hudson*, for appellees.

BANKE, Judge, dissenting.

The trial court granted summary judgment to the defendant editors in this libel action based on a determination that their published reply to the plaintiff's letter was non-libelous as a matter of law. I concur in that determination; therefore I must dissent.

"A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." OCGA § 51-5-1. "Liability for libel may attach when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader." Hotchner v. Costillo-Puche, 551 F2d 910 (2d Cir. 1977). "[I]n considering whether a writing is defamatory as a matter of law, we look . . . at what construction would be placed upon it by the average reader. *Southeastern Newspapers v. Walker*, 76 Ga. App. 57, 60 (44 SE2d 697); *Atlanta Journal Co. v. Doyal*, 82 Ga. App. 321 (3), 330 [60 SE2d 802]; *Garland v. State*, 211 Ga. 44, 48 (84 SE2d 9)." *Macon Tel. Pub. Co. v. Elliott*, 165 Ga. App. 719, 721 (302 SE2d 692) (1983).

"A plaintiff cannot avoid a summary judgment by taking statements out of context to force a libelous meaning when none otherwise exists." Raymer v. Doubleday & Co., 615 F2d 241, 245 (5th Cir. 1980).

The majority appears to agree with the plaintiff's contention that a reasonable interpretation of the answer to her letter is that she is a sexually promiscuous lady. However, I must agree with the trial court that, crude and insulting though it may be, the answer does not purport to make any factual statement at all regarding the plaintiff. Indeed, the defendants do not even purport to know her. While the reply certainly demonstrates sarcastic contempt for the plaintiff's desire for moral responsibility and good taste in the *Cadaver*, any defamatory implications in it are directed to the editors themselves rather than the plaintiff. Accordingly I do not believe that consistent with

the First Amendment, it may be construed as libelous. Accord Pring v. Penthouse Intl., 695 F2d 438 (10th Cir. 1982). I would affirm the judgment of the trial court.

I am authorized to state that Judge Sognier and Judge Pope join in this dissent.

SOGNIER, Judge, dissenting.

I concur fully with Judge Banke's dissent and further dissent for the following reason.

In determining the actionability of the written statement we have here, it is important to keep in mind the context in which the exchange of words was made. The *Cadaver* is a medical student's publication and affidavits, and past issues made part of the record, show that a predominant part of the publication is devoted to heavily satirical and blatantly obscene jokes and observations. Letters to the editors of the *Cadaver* are usually accompanied by pungent, outrageous repartee, intended for the amusement and entertainment of the paper's readers. Considering the publication as a whole and the typical reply by the editors to other letters, there is nothing to indicate that appellant was maliciously singled out for particular abuse or ridicule by appellees. Even when looking specifically to the reply to appellant's letter, there is nothing to indicate that appellees were referring to some secret knowledge of appellant's sexual reputation. On the contrary, appellees, by holding themselves up to ridicule with their description of their own ancestry, removed any possibility that the "punch line" to their reply could be taken as imputing immorality, promiscuous relations or unchaste behavior by appellant.

Furthermore, appellant, in writing the *Cadaver* and calling its contents "sick," "junk," "trash," something "to be dug out of the garbage heap" and "for the bottom of bird cages," purposefully instigated this exchange of words. Appellant deliberately poked at a hornet's nest: she should not now be allowed to seek salve for her stings from this court. See McGee v. Collins, 100 S 430, 435 (9) (1924) (one who provokes a libel not allowed to recover against another who has retaliated in kind).

I am authorized to state that Judge Banke and Judge Pope join in this dissent.